LILLIAN M. HEIDLAND (PLAINTIFF), RESPONDENT, v. SEARS ROEBUCK & COMPANY, A CORPORATION (DEFENDANT), APPELLANT.—110 S. W. (2d) 795.

St. Louis Court of Appeals.  Opinion filed December 7, 1937.

*Anderson, Gilbert, Wolfort, Allen & Bierman* for appellant.

*J. Edward Gragg* for respondent.

HOSTETTER, P. J.—This suit was begun on the 1st day of February, 1935, in the Circuit Court of the City of St. Louis. The substance of the amended petition, on which the case was tried, was to the effect that defendant, on January 26, 1933, negligently permitted the entrance to its store on the east side thereof and its vestibule and hall leading from said entrance into the store and adjacent to the steps leading to the basement of said store, to become covered with water and other slippery foreign substance and did not exercise ordinary care to remove same and prevent injury to customers and patrons; that as a direct result plaintiff slipped and fell on the water and other foreign substance on the floor adjacent to the steps leading

to the basement, whereby she sustained injuries; that defendant permitted such water and dangerous substance to remain on the floor at the places mentioned when it knew, or, by the use of ordinary care, could have known, that its customers and patrons were likely to slip and fall on such slippery floor when by the exercise of ordinary care it could have mopped up said floor and dried it or covered it with a mat and made it safe, but carelessly and negligently failed to do so and, by reason of such negligence, plaintiff, who was a customer was caused to slip and fall on said floor at said point where it was covered with water and other dangerous and slippery substance and thereby became injured. She prayed a recovery of judgment for $3,000.

The injuries catalogued in her petition as having been sustained by her were as follows: "plaintiff's back and spine, sacroiliac joints, left leg, and knee, and the bones, muscles, tendons, tissues, nerves, ligaments, membranes, cartilages and joints thereof were severely wrenched, twisted, torn, lacerated, infected, inflamed, bruised, contused, separated, fractured, sprained, dislocated, broken and swollen; that she sustained a concussion of the brain and a severe nervous shock; that both of plaintiff's legs and knees were bruised, contused and lacerated; that she now suffers with headaches, sleeplessness and weakness; that her nervous system has been impaired and weakened; that all of the said injuries are serious and permanent, and the function and use of all said parts has been impaired, limited, and rendered painful; that plaintiff has suffered and will suffer pain."

The answer contained a general denial with the further allegation that if plaintiff suffered injuries it was due to her own carelessness and neglect in that she failed to exercise ordinary care to look and observe where she was walking and negligently and carelessly overstepped the tread of the staircase she was attempting to descend.

Upon a trial, which was concluded on October 22, 1935, the jury returned a verdict in favor of plaintiff for $250, upon which a judgment was entered and defendant in due course brings the cause to this court by appeal for review.

The only question raised on this appeal is that the trial court erred in not sustaining the instruction offered by defendant in the nature of a demurrer to the evidence at the close of plaintiff's case and also a similar instruction offered at the close of the whole case. This assignment of error will require a review of all the testimony relating to the cause and manner of plaintiff's fall, and of the attendant circumstances and surrounding conditions.

The plaintiff, Lillian M. Heidland, was a woman forty-nine years of age and had been for three years prior to her fall in the store, operating a bake shop in the city of St. Louis, at 6232 Natural Bridge Road. On the day of her injury in question, she came to defendant's store on North Kingshighway at about 7:15 P. M., accompanied by

Fred Helmkamp, who drove her to the store in his automobile and parked it on the parking lot at the rear, or east end, of the store, and they gained entrance to the store at what is referred to as the rear, or east entrance.

This entrance had two doors, and, one entering the store by either of these doors, first came to a vestibule or platform just inside the doorways, which is shown by testimony to be about 8 or 10 feet wide from east to west and approximately 16 to 18 feet long from north to south. There was a stairway which led from the south portion of the vestibule or platform up to the first floor. Also a stairway which led from the north portion of the vestibule or platform down to the basement. The stairway to the first floor had approximately five steps, the one leading to the basement had approximately 18 or 20 steps. The steps leading to the first floor and those leading to the basement were divided by a center handrailing.

When plaintiff and her friend Helmkamp first entered the store they ascended the flight of five steps to the first floor and made various purchases on the first and second floors. Then they separated making arrangements to meet in the tire department in the basement.

After plaintiff had finished making the purchases on the upper floors she started toward the basement and her testimony as to what she did just before she fell, and the manner of her fall, is as follows:

"Q. And when you came in the store, did you look at the platform, or see anything on the platform? A. I did not.

"Q. Now, when you came a half hour, approximately, later, when you came from the second floor down to the first floor, did you go down the steps there from the second to the first floor? A. Yes, sir.

"Q. Now, I want to ask you this question, please, ma'am: The stairway leading from the first floor to the second floor, and likewise the steps leading from the platform to the basement, are they divided by anything? A. They are, by a center railing.

"Q. Are you right-handed or left-handed? A. I am left-handed.

"Q. Now, when you got down the stairway from the first floor to the platform, what side of the stairway were you on? A. I was on the right-hand side, but at the left-hand rail.

"Q. Were you holding to the rail on your left-hand side? A. Yes, sir.

"Q. Did you notice anything on the platform at that time? A. No, sir; I did not.

"Q. Now, then, when you walked down, if you know, just tell the jury, after you walked down this five or six steps to the first floor, to the platform, tell the jury, please, ma'am, just what you did then; just look right at them and tell the jury what happened? A. I walked over to go down into the basement, to the tire department, where it was then, and is now, at the foot of the stairs, and I went over and took the rail with my left hand, and as I reached to take it my foot

slipped out to the edge of the step and threw me forward. I grabbed to the banister, to break the fall, and as I grabbed to that banister my feet went in back of me and I felt something crunch or crack in my back at that time, and I fell halfway down, and from then on I don't know anything what happened.

"Q. Now, did you see anything on the platform at any time before you had fallen? A. No, sir; I did not see a thing.

"Q. Had you yet reached the steps at the time you had fallen? A. No, sir; I was just ready to take the banister when my foot slipped out.

"Q. What banister was that? A. That was the center rail, going to the basement, on the right-hand side as you go out.

"Q. Kindly tell the jury, please, ma'am, whether it was just one rail down the center, or whether there were two rails down the center? A. There was a double rail, and I took the one on my side, the left-hand side.

"Q. Now, at the time you fell, just describe to the jury how you fell, how your foot and how your back went and how your body went? A. I slipped. I could not say which foot slipped, but one of them slipped, and when it hit the edge of the step it threw me forward, and I was all ready to take hold of the banister, and I grabbed it, holding to it tight, and my feet and body was in back of me, and just as I grabbed to the banister, that last that I remember there was just like a crack, kind of a crunch; I don't know what you call it.

"Q. What is the next thing that you remember after that, Mrs. Heidland? A. I remember that there was a number of people there gathered around on the step where I was.

"Q. Where were you at that time? A. I was about halfway down the steps."

She further testified, in response to a question propounded by her attorney, that when she was in the emergency room she noticed that the bottom of her dress was wet.

On cross-examination she testified as follows:

"Q. And then when you went up to the second floor and completed your purchases, you, by prearrangement, started down to meet Mr. Helmkamp in the basement, didn't you? A. Yes, sir.

"Q. And you walked down this flight of five steps, didn't you? A. It was not going down from the second floor.

"Q. Well, you did walk down the flight of five steps? A. Yes, sir.

"Q. From the first floor to the platform? A. Yes, sir.

"Q. And you noticed nothing in the way of water or foreign substance or anything on these steps as you walked down them, did you? A. I never noticed anything.

"Q. Yes, and then you turned around on the platform and started to go down the steps to the basement, didn't you? A. I did.

"Q. And you never noticed any water or foreign substance or anything of that kind at all on that platform the second time you got there, did you? A. I did not notice a thing.

"Q. No. And you noticed no foreign substance of any kind on the steps leading into the basement, did you? A. I did not look at that.

"Q. Now, when you first went in there with Mr. Helmkamp, he didn't call your attention to any water on that platform, did he? A. No, sir.

"Q. You came in off of the parking lot in the rain without an umbrella, didn't you? A. Yes, sir."

Her witness, Mr. Helmkamp, testified as follows:

"As you come in the door from the parking lot there are two sets of stairways, one leading to the first floor and one to the second floor, and both are divided by a railing in the center. I judge that the steps are about ten feet wide.

"By MR. GRAGG (Q.): Now, did you see anything on the platform there? A. I saw about two pools of water.

"Q. Where were these two pools of water, Mr. Witness? A. One was near the center railing on the side of the steps and one was on the landing.

"Q. About how big were these pools of water? A. I judge about a foot, maybe a little bit more.

"Q. About how near were they to the top of the steps? A. About a foot; might have been a little bit more, a foot and a half.

"Q. Where were they with reference to the center rail; were they right opposite the center railing, or were they to the north or to the south? A. Well, they was on the north side of the center railing, the one going down stairs, and the other one was about the same place on the north of the one going up to the first floor."

Plaintiff's witness, Helmkamp testified further on cross-examination as follows: That he had not seen plaintiff until about six months after the accident; that he saw her again at lodge meeting about a year after the accident; that he was doing some work for plaintiff refinishing one of the show cases at the time of the accident and that she had been his friend for three years; that he took her down to the defendant's store as an accommodation; that after he had carried her up the stairs and attempted to get the doctor he did not go to see her and knew nothing about how she was getting along until six months after the accident, but that his folks went over there to see her once in a while; that he did not see her fall and did not know where she fell and did not know what caused her to fall, but that he saw two men holding her up, and when he carried her to the rest room he felt that the bottom part of her dress was wet; that his deposition was taken at the law office of defendant's counsel on July 3, 1935, and that he returned about two weeks thereafter, read and signed it and made

affidavit that the statements therein contained were true; that before he came down and had his deposition taken he had been to the office of the attorney representing the plaintiff and had told him at that time all he knew about the case; that he had seen this attorney once before, that the attorney had called up and he went down and told him all about the accident and then later he got a subpoena to appear at the office of defendant's attorney and give his deposition; that he again went and saw plaintiff's attorney after he had been subpoenaed for his deposition; that that was the second time he had seen him; that the reason he went down to see him was to see what it was all about; that he knew this attorney was Mrs. Heidland's lawyer; that the lawyer had called up and asked him about everything he knew and that he tried to tell him everything; that when the depositions were taken that he testified about seeing the two pools of water and that he also testified that he was not able to locate on what part of the platform they were; that he was asked twice during the taking of the depositions about these pools of water; that he was then telling everything he could remember about the accident; that he could not remember whether he had talked to plaintiff after the giving of his deposition or not; that the last week before the trial her lawyer called him up and told him to be down at court and that he asked him if there were any pools of water and that he answered yes, but he did not recollect where; that he had located the water since the deposition had been taken; that every time he went into Sears Roebuck he had that on his mind and every time he went up that stairway he thought about it; that the reason he thought about it was that if he could be of service to somebody he would have to remember it; that he thought it might be of service to be able to locate those pools of water up near the head of the steps, but that nobody had ever told him that it would be of service to Mrs. Heidland to locate them there.

In answer to a question by the cross-examiner as to what made him think that it would be of service to Mrs. Heidland for him to remember two years afterward that these pools of water were up near the head of the steps and what made him think of that, he replied: "Well, I saw people slip and slide on water before."

He further testified that Mrs. Heidland didn't tell him anything, that she didn't even tell him where she fell; that he could not recall that Mrs. Heidland had an umbrella at that time but that he had no umbrella; that some of the people he saw going in and out had umbrellas; that as he walked in there and walked up the first five steps he noticed a little water on the steps, such as anyone could see on any rainy day in any store from people walking in and that he had no trouble noticing it; that the lights were good and the steps in good condition; that it was a new building; that the closing time of Sears Roebuck was nine o'clock; that it was around closing time when Mrs. Heidland went home; that she was up on the second floor

being looked after about three quarters of an hour; that when they arrived that evening he parked at the edge of the brick alley, which was 15 to 18 feet wide, and walked across the cinders getting into the store about 7:15; that he and Mrs. Heidland were upstairs about a half to three quarters of an hour.

No other testimony was introduced by plaintiff as to the cause or manner of her fall or of the surrounding conditions.

Defendant's testimony tended to prove that plaintiff's fall was due to the fact that she overstepped at the head of the stairway, and that there was no water or foreign substance on the platform or steps that caused the mishap.

We are mindful of the established and well recognized rule that in passing on the question as to whether plaintiff has made a submissible case for the jury, she should be given the benefit of all the testimony favorable to her and also the benefit of all reasonable and legitimate inferences deducible from such testimony.

It is obvious that plaintiff, being a housewife, and the proprietress of a store herself, knew that on a rainy day, with people going in and out of a store, would necessarily cause a certain amount of moisture inside the doorways, and would realize the impossibility of the store proprietor keeping such moisture out. People with wet feet, dripping clothes and dripping umbrellas coming and going as customers in a large establishment, such as defendant operated, made it a physical impossibility to keep floors from becoming damp and wet. So that, the law only imposes the duty on storekeepers to use ordinary care to keep their premises in a safe condition.

The defendant was not an insurer against all hazards arising from the use of its platform and steps. The only way it could have kept its platform and steps in perfect condition, free of water which was being brought in by its customers during a heavy rainfall, as shown in this case, would have been to have provided a sufficient number of employees to follow each customer with a mop as he entered and to have mopped up after him whether he went upstairs or downstairs into the basement until all the water he had brought in from his wet feet, dripping clothes and dripping umbrellas had been eliminated. This would certainly be an unreasonable burden to impose on a storekeeper. [Williams v. Kansas City Terminal R. Co., 288 Mo. 11, 231 S. W. 954.]

In Cluett v. Union Electric Light & Power Co., 220 S. W. 865, the Supreme Court said:

"We cannot shut our eyes to the fact that throughout the state, and especially in the cities and towns, many of our citizens own homes in which the parlor, and possibly other rooms, are furnished with hardwood floors, upon which rugs are frequently placed. It would not for a moment be deemed unsafe for the owners of these homes to have as guests their friends and relatives. Yet, if liability should attach in

this case, it would practically make the owner of each home an insurer of the safety of invited guests as against any damages which might be sustained by them in slipping and falling on the floor. It is evident that the owners of such homes proceed on the theory that invited guests, while exercising ordinary care, can walk in safety on said floors.''

In English v. Schlender, 47 S. W. (2d) 150, l. c. 153, this court, in an opinion written by Commissioner Bennick, stated this rule as follows:

''Generally speaking, the rule is the owner of premises is liable to an invitee, using due care, for an injury to him occasioned by the unsafe condition of the premises which is actually or constructively known to the owner, but not to the invitee, which the owner has negligently suffered to exist, and of which the invitee has no knowledge or notice.''

In Mullen v. Sensenbrenner Mercantile Co., 260 S. W. 982, l. c. 985, appears the following pronouncement, viz:

''Under the above authorities, we are satisfied that, if there had been any negligent condition of the entrance, plaintiff's failure to look where she was walking when she went out and was injured was such contributory negligence on her part, as a matter of law, as to bar her recovery in this case.''

See also Main v. Lehman, 294 Mo. 579, 243 S. W. 91, and Achter v. Sears Roebuck & Co. (Mo. App.); 105 S. W. (2d) 959, where similar views are announced.

In the case of Fader v. S. S. Kresge Co., 116 Ohio State 718, 158 N. E. 174, the Supreme Court of Ohio, in passing on a case where the facts were almost identical with the facts in the case at bar, held that plaintiff made no case. In that case the facts were as follows: Plaintiff with three companions, her husband, his brother and his brother's wife, entered defendant's store at about 3:30 P. M. on a Saturday. It was raining at the time, and had been for some time immediately prior thereto. The four persons walked on the wet sidewalk for some distance before reaching defendant's store. The evidence of plaintiff was conflicting as to which person entered the store first. The court stated:

''The floor immediately inside the door was somewhat wet and slippery, due only to the fact that the incoming customers had carried in water on their feet from the sidewalk, and the further fact that some rain had blown in as the door was opened by incoming and outgoing shoppers, many of whom were in the store at the time. Some of the shoppers had umbrellas, the drip from which may have added somewhat to the dampness on the floor.

''This wet spot was irregular in shape and extended, and in general was shown by the evidence to be about as wide as the door, and extending from the door inward from three to five feet. It was wet

enough to be slippery, and there was moisture enough to soil the coat of Mrs. Fader as she fell on that spot."

Negligence charged was not having a rubber mat on this particular part of the floor; permitting this moisture to be on the floor; in not warning customers of the wet floor at this point; and in failing to exclude customers while this condition lasted.

In disposing of the case the Supreme Court of Ohio said:

"The store owed her the same degree of care that all stores owe all patrons who enter; that is to say, the store owed her the duty to exercise ordinary care for her protection against injury while in the store."

The court further said:

"There were no defects in the floor itself. No claim is made that it was other than level, or that it was improperly constructed or surfaced in any manner. There was no soap or soapy water on the floor; no grease on the floor. There was nothing of any kind on the floor except the rainwater which got there in the manner stated."

In holding there was no case, the court said:

"It is not the duty of a person in control of such building to keep a larg force of moppers to mop up the rain as fast as it falls or blows in, or is carried in by wet feet or clothing or umbrellas, for several very good reasons, all so obvious that it is wholly unnecessary to mention them here in detail."

See also Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278, and Cash v. Sonken-Galaba Co., 322 Mo. 349, 17 S. W. (2d) 927, which hold that the owner of property is not an insurer of the safety of persons even when he has invited them to enter and that there is no liability for injuries that are obvious or are as well known to the person injured as to the owner or occupier.

Defendant pleaded contributory negligence on the part of plaintiff, and such a plea was peculiarly applicable to plaintiff on account of the fact that her business as a storekeeper made her aware of such conditions.

Inasmuch as the testimony introduced by the plaintiff showed that the vestibule and stairways were properly lighted and no defects of construction existing in the vestibule, floor, or stairway and nothing to prevent her from seeing water or other foreign substances, which might cause her to slip and fall, the fact that she didn't look at the steps or the floor, when, to look was to see, makes the plea of contributory negligence available.

Even if the two so-called pools of water testified to by her witness Helmkamp as having existed, actually did exist and were at the identical places he finally placed them in his desire to render her a service, she cannot escape the duty imposed on her to look where she is walking, particularly where one is starting to go down steps. She admits she saw no water; she does not even testify that she slipped

because of water. She did not remember which foot did the slipping. She further said that she did not look at the steps, being the identical steps she fell down.

In view of the rule which we have heretofore adverted to, which requires us in ruling on this demurrer to plaintiff's case to take as true all testimony tending to support her case, and disregard all testimony which conflicts with testimony favorable to her case and to give her the benefit of all reasonable and legitimate inferences deducible from the testimony, we find no difficulty in treating as true the testimony of her witness Helmkamp to the effect that when they first entered the store he saw the two pools of water on the platform. But, in view of the fact that this witness testified by deposition shortly prior to the trial, that he then had no recollection of the location of those pools, and the further fact that he refreshed his memory in the manner heretofore set out, and for the purpose of being of service to the plaintiff, so that, on the trial he testified that they were located at the head of the basement steps where the plaintiff would necessarily be required to pass through them, in descending the steps, we find some difficulty in treating this portion of his testimony as true.

In Hill v. Illinois Terminal Co., 100 S. W. (2d) 40, this court, speaking through Judge McCULLEN, used this language, viz:

"The rule which requires us, in considering a demurrer to the evidence, to take plaintiff's evidence as true and to give him the benefit of every reasonable favorable inference arising from all the evidence and to disregard defendant's evidence where it conflicts with plaintiff's evidence, does not go so far as to require us to disregard the dictates of common reason and to accept as correct or true that which obviously, under all the circumstances in evidence, cannot be correct or true, nor does it require us to give plaintiff the benefit of any other than reasonable inferences. In the case at bar it is clear that, disregarding defendant's evidence and giving plaintiff the benefit of all favorable reasonable inferences arising from all the evidence, it appears that he was guilty of such contributory negligence as to bar him from the right of recovery as a matter of law."

However, regardless of the strain which the testimony in regard to the locating of the pools places on one's credulity, we will assume their location to be immediately adjacent to the head of the steps leading down into the basement.

Plaintiff's counsel advance the argument in respect to the location of the pools of water that a condition once shown to exist is presumed to continue until the contrary is made to appear. Granting the soundness of this rule of law, it only accentuates the negligence of plaintiff in failing to look and see the water.

We therefore hold that the plaintiff, as a matter of law, failed to make a case entitling its submission to a jury, and, therefore, the judgment of the trial court should be reversed, and, it is so ordered.

*Becker* and *McCullen, JJ.,* concur.